## Lapp, Administrator v. Louisville, Henderson & St. Louis Railway Company.

(Decided January 15, 1918.)

### Appeal from Meade Circuit Court.

1.  Railroads—Trespasser on Bridge—Duty Owing to.—The only duty that trainmen owe to a trespasser is to exercise ordinary care by all the means at command to avoid injury to him, after his pres-

ence is actually discovered. The same rule applies on a bridge or trestle as to trespassers at any other place. The fact chat the engineer if he had been looking might have discovered his presence sooner than he did, will not make the company liable, as no lookout duty is due to trespassers.

2. Railroads—Notice to Employe That Trespasser Is on Track—When Under Duty to Warn Engineers.—Where a station agent knew that a person in a drunken and helpless condition was on · the track, it was his duty to warn a passing train of the presence of the trespasser, when he had opportunity to do so; but a watchman at a bridge was under no duty to give warning to the engineer of the fact that a sober, intelligent man was on the bridge, when he had previously warned the man that a train was coming and not to go on the bridge.

3. Railroads—Trespassers on Bridge—Notice to—Duty of Engineer.—Where an engineer saw a man on a bridge whom he believed to be a bridge carpenter who would get out of danger as soon as he ' was warned, he was not remiss in his duty because he did not apply his emergency brake until after he had sounded the alarm whistle and discovered that the man was a trespasser and not a bridge workman.

HARRY WALLINGFORD and CLAUDE MERCER for appellant.

J. R. SKILLMAN, J. D. HARDIN and WOODWARD & DIXON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Allen Taylor, an intelligent and sober colored boy ·about 16 years old, while traveling as a trespasser on a trestle on the appellee's line of railway, was killed by a freight train, and in this suit by his administrator to recover damages for his death, the trial court directed a verdict in favor of the railway company, and this appeal is prosecuted by the administrator.

At a place called Otter Creek the railway company has a trestle something over 500 feet long, varying in height from 25 to 9 feet from the ground, at the point ' where Allen Taylor was killed being about 9 feet.

It appears from the evidence that about noon on the day of the accident Taylor, while walking on the track east of the trestle on his way towards Brandenburg, which was west of the trestle, was passed by two men, who were also on the track going on their way west. They had some conversation with Taylor, who they testified was sober and intelligent, in the course of which he told them he was trying to catch a freight train to get a ride. After walking together some little• distance they proceeded

ahead of him and had crossed the trestle and were some
yards beyond the west end when he reached the east end.

It is further shown that on account of some new work
that had been done on the track immediately east of the
trestle the company had stationed near the east end one
of its employes named Marcum to observe the condition
of the track and give such notice or warning as might be
necessary to passing trains. Marcum was probably a
hundred feet east of the trestle when the whistle of a
freight train going west was heard about half a mile
away. About the time the train whistled Marcum told
Taylor, who had stopped a moment to talk with him, and
who had started towards the trestle, that there was a
good road under the trestle and he had better walk
there; that a train was coming, and he had better look out
for it, and Taylor said he would look out. Marcum says
that he did not after that pay any more attention to
the boy, nor did he give the engineer as he passed any
warning or notice that Taylor was on the trestle.

It is also shown by the evidence that the bents in the
trestle were six feet apart and that at each bent on each
side of the track there was a timber from 12 to 14 inches
wide which projected about 2½ feet beyond the ends of
the ties. And in addition to this there was a platform on
the side of the track on which persons could stand to
escape passing trains at or close to the point where Tay-
lor was struck by the train when he had gotten nearly to
the west end of the trestle.

The evidence also discloses that the track for about
1,300 feet east of the trestle was straight, and that the
engineer of the train, which was running when it ap-
proached the trestle about twenty miles an hour, if he
had been looking could have seen Taylor on the trestle
before the engine came to the point where Marcum was
standing about a hundred feet east of the trestle. And
there is further evidence tending to show that this train
could have been stopped before striking Taylor if the
engineer had made an effort to do so before the engine
reached the east end of the trestle.

The engineer testified, in substance, that when the
engine passed Marcum he was about a hundred feet east
of the east end of the trestle, but that he did not give
him any signal to stop or lessen the speed of his train, or
any signal that would indicate that there was any reason
for either stopping or slowing down; that he saw Mar-
cum several hundred feet before he passed him, and kept

his eye on him and the track until he passed him; that
when he first saw Taylor the engine was at the east end
of the trestle and he judged Taylor was about the mid-
dle of the trestle; that when he first observed him ho
sounded the alarm whistle and applied his air-brakes, tho
speed of the train at the time being about twenty miles
an hour; that Taylor was struck by the engine when he
was about 150 feet from the west end of the trestle, and
that when the train was stopped the body of Taylor was
found under the car next to the engine; that when ho
first saw Taylor he was walking on the trestle with his
back to the engine, and he observed him start to run; that
Taylor for some reason fell on the track when the en-
gine was 30 or 40 feet from him; that when he first no-
ticed his presence he was about 340 feet ahead of him;
that he first sounded the alarm whistle and then applied
the emergency brakes, bringing his train to a stop in less
than 300 feet after the brakes were applied; that his
train was well equipped in every way and he stopped it
as soon as it was possible to do so; that when he first saw
Taylor he thought he was one of the men that had been
working on the bridge and was of this impression when
he sounded the alarm whistle, and believing the person
he saw to be one of the bridge men, he anticipated that
when his attention was called by the alarm whistle to the
coming train he would get out of the way at one of the
bents, but that when the man commenced to run he knew
he was not one of the bridge men.

Without further relating it, we may say that the
evidence shows without contradiction: (a) That Taylor
was a trespasser; (b) that he was warned the train was
coming and not to go on the trestle; (c) that every six feet
there were caps on which he could have stood in safety
while the train passed; (d) that he could have jumped
from the trestle to the ground, a distance of not over
nine feet, and escaped injury; (e) that as soon as the en-
gineer saw Taylor on the trestle, or at least as soon as
he discovered that he was not one of the bridge men, he
exercised all possible care to stop the train before strik-
ing him.

But, notwithstanding these facts, and the reckless neg-
ligence exhibited by Taylor in undertaking to walk across
the trestle under the circumstances, it was, nevertheless,
the duty of the engineer, after he actually discovered his
peril, to exercise ordinary care with all the means at his
command to stop his train or lessen its speed so as to

avoid striking him. This is the full measure of duty persons in charge of a train owe to trespassers, as has been announced by this court in numbers of cases; and tested solely by this rule, there would seem to be no doubt about the correctness of the ruling of the trial court in directing a verdict, as the undisputed evidence shows that the engineer, after he actually discovered the presence of Taylor, did exercise ordinary care with all the means at his command, and in fact did everything that could be done to prevent injury to him.

But it is said that there are two features in this case that take it out of the ordinary rule relating to trespassers: (1) That as Marcum knew Taylor was going on the trestle, it was his duty to signal the engineer to stop his train, or at least to slacken its speed, neither of which he did: (2) that a person on a trestle when a train is approaching is necessarily in a position of peril, and there was sufficient evidence to take the case to the jury on the theory that the engineer saw, or could have seen, Taylor on the trestle in ample time to have stopped his train before striking him.

In support of the first proposition the case of Glenn's Admr. v. L. & N. R. R. Co., 28 Ky. L. R. 949, is relied on. Glenn was killed by one of the trains of the railroad company while wandering on the track in a state of helpless intoxication. The petition, to which a demurrer was sustained, averred "that appellee's station agent at that station was notified of the fact that decedent was then on appellee's line of railway in a helpless, drunken condition, 75 yards ahead of the train, and that he received such notice before the train came to a stop at the station; that it stopped there for one minute before passing on, but that the agent failed to give notice to those in charge of the train that decedent was then on the railway; that had he done so, the train could have been stopped without damage or loss to appellee or its passengers, and the life of decedent could have been saved. But that having failed to give such notice, the engineer of the train, being in ignorance of the facts, ran the train against and over the decedent and killed him." This court, however, held that the petition stated a good cause of action, saying that it was the duty of the station agent to have notified the persons in charge of the train of the presence of Glenn on the track; and that the railroad company was accountable for this breach of duty on the part of its agents.

Another case relied on is Fagg's Admr. v. Louisville & Nashville R. R. Co., 111 Ky. 30. Fagg, with the knowledge of one of the railroad company's station agents and also its superintendent, was on the track in a drunken and helpless condition, of which condition and his place of peril they had notice in time to have given warning to a train that was approaching, but they failed to do so, and Fagg was killed by the train. In holding that the case should have gone to the jury, the court said:

"Should the company be held responsible because its superintendent at Nashville and its agent at Franklin knew that the decedent was on the track in a drunken and helpless condition, and that shortly thereafter a train would pass over its track through the cut, and failed to notify those in charge of it of his situation, and thus avoid the calamity which befell him? We think it should. The knowledge of these officers was the knowledge of the company. From the averments, they could have avoided the injury by the exercise of ordinary care." To the same effect is C., N. O. & T. P. Ry. Co. v. Marrs' Admx., 119 Ky. 954.

But, plainly, the rule announced in the cases cited should not be applied to the facts of this case. Taylor was neither ignorant, drunk, feeble nor helpless, nor so young in years as to need protection. After Marcum told him the train was coming and that he ought not to go on the trestle, there was no reason why he should have given him any further attention, and he was not guilty of any negligence or breach of duty in failing to observe the course that Taylor pursued. He had the right to and apparently did assume that Taylor was capable of taking care of himself and would not needlessly put himself in a place of danger after he had been warned that the train was coming.

In reference to the second proposition, it is true that the track was straight for several hundred feet east of the trestle, and it is fair to say that if the engineer had been keeping a careful lookout, or, indeed, any reasonable lookout, ahead, he could have seen Taylor on the trestle at or before the time the engine reached the place where Marcum was standing, about a hundred feet east of the east end of the trestle; and it also appears that if the presence of Taylor on the track had been discovered by the engineer when the engine was at this point, the train could have been stopped before striking Taylor; but Taylor being a trespasser, the engineer was under no

duty to keep a lookout for him. He was under no duty to anticipate his presence on the trestle, nor, as we have said, was he under any duty to exercise ordinary care to stop the train with the means at his command until he actually discovered the presence of Taylor on the trestle. Engineers are under no more duty to keep a lookout for trespassers on trestles than they are at any other place on the track where there is no duty to anticipate the presence of persons, or where travelers have no right to be. Thus it was said in Smith's Admr. v. Illinois Central Ry. Co., 28 Ky. L. R. 723:

"The evidence, without contradiction, showed that the decedent was a trespasser upon the railroad bridge of appellee, and the trial judge properly held her personal representative to all of the consequences flowing from her being wrongfully upon it. The employes of the corporation owed her no lookout duty whatever. All they were required to do was, after actually discovering her peril, to exercise ordinary diligence to stop the train in order to avoid injuring her. This proposition of law has been so often decided, and so uniformly upheld, that it is now quite beyond question. The railroad had the exclusive right to the use of its line at all points save those where the public had a right to be, and was under no duty to anticipate the presence of trespassers." And this rule has been iterated and reiterated in many cases without deviation.

The previously written case of Becker v. L. & N. R. R. Co., 110 Ky. 474, may contain some expression inconsistent with what was said in the Smith case, but as was said by the court in Goodman's Admr. v. L. & N. R. R. Co., 116 Ky. 900: "This court has repeatedly held that a railroad company owes no duty to trespassers upon its track at places not frequented by the public by right or permission, until their peril has been discovered. And we do not understand that this well-grounded rule was changed by the decision in Becker v. L. & N. R. R. Co."

Also in Spiegle v. C., N. O. & T. P. Ry. Co., 170 Ky. 285, the following comment on the Becker case may be found: "The case of Becker v. L. & N. R. R. Co., 110 Ky. 474, cited by appellant, is not analogous to the case here. In that case there was evidence that the engineer saw children upon a bridge in ample time to have avoided injuring them, but negligently failed to do so, believing the children had ample time to get off of the bridge.

And while in the opinion in that case a statement is made in discussing the duties of the engineer that seems to support appellant's contention, it is a mere dictum, and as counsel for appellant conceded, has never been followed in this state.''

The cases of L. & N. R. R. Co. v. Bell, 32 Ky. L. R. 1312, and Williamson & Pond Creek R. R. Co. v. Charles' Admr., 168 Ky. 41, are relied on by counsel for appellant, but there is nothing in either of these cases in conflict with the rule laid down in the Smith case, *supra*.

In Creager's Admr. v. Ill. Cent. Ry. Co., 134 Ky. 543, we said: ''It is claimed by appellant, and some of his evidence tended to prove, that a person walking on the railroad at the point where the intestate was killed could have been seen by the engineer or fireman of the train, if maintaining a lookout, a distance of 750 feet or 250 yards before reaching him. This may be true, and yet the fact would not authorize a recovery, in the absence of evidence conducing to prove that the engineer or fireman did see the intestate, and, after discovering his peril, might by the exercise of ordinary care have prevented the train from striking him. . . .

''In a case where the person injured and killed is a trespasser on the railroad company's track, the decisive question is, not whether those in charge of the train might have seen the trespasser by maintaining a proper lookout, but did they see him and know of his peril, and, if so, could they by the exercise of ordinary care have prevented injury to him?''

In Nashville, C. & St. L. Ry. Co. v. Bean's Exr., 110 S. W. 328, we said: ''The fact . . . that, if deceased had been walking on the track the engineer, if keeping a lookout, must have seen him in time to have stopped the train, if he exercised ordinary care, falls far short of showing when the peril of the deceased was actually discovered by the trainmen or that, in the exercise of ordinary care, by the use of all reasonable means at hand, they could have prevented striking him after his peril was so actually discovered. We cannot supply the failure in the evidence for appellee to show the existence of these facts so indispensable to a recovery by assuming that, as the track was straight, the persons in charge of the engine must have discovered the peril of deceased in time to prevent injury to him by the exercise of ordinary care on their part. . . . And they were under no duty to discover it any sooner than they did, when-

ever that was. They may not have been keeping a lookout, or, if keeping one, may have concluded that the deceased, if he was either at the south or north end of the trestle, would get off the track in time to avoid being injured. In cases like this, where it is sought to recover for injury to a trespasser on the track, there must be some evidence conducing to show two things: First, when the persons in charge of the train actually discovered his peril; and, second, that after the discovery they could, by the exercise of ordinary care, with the use of all reasonable means at hand, prevent injury to him."

Some question is made out of the fact that the engineer did not testify positively as to when he first discovered the presence of Taylor, but he did testify that as soon as he saw a man on the trestle he sounded the alarm whistle, believing at the time that the man he saw was one of the bridge men, and that immediately thereafter when he discovered that the man was not one of the bridge men, he applied his emergency brakes and did everything that could be done to stop the train. In this connection it should be said that bridge carpenters or workmen were often on this trestle about the time this accident happened, and the engineer is not to be held remiss in his duty or the company to be charged with negligence if the engineer when he first saw a man on the trestle believed he was one of the bridge men and would get out of the way, as he could easily have done by stepping on one of the caps when his attention was called to the approach of the train by the blowing of the alarm whistle, or because he did not, as soon as he discovered the presence of the person, use his emergency brake.

If, as testified to without contradiction by the engineer, he believed, as he had the right to believe, that the man he saw on the trestle was a bridge man, he was only under a duty to give such warning and take such action as in the exercise of ordinary care was necessary to give him warning of the approach of the train, for if the man had been, as the engineer reasonably supposed, a bridge workman, he could and would easily have escaped danger by getting on one of the caps before the train reached him, even if its speed had not been reduced; and so, as we have said, the engineer was not guilty of any negligence in failing to apply the emergency brake until he discovered that the man was a trespasser and not a bridge employe, and this he did.

Some point is also sought to be made out of the fact that an experiment made some time after this accident showed that a train similarly equipped and loaded as was the train that killed Taylor, could have been stopped in a shorter distance than this train after the engineer discovered the presence of Taylor on the track. But we attach little importance to this experiment because the uncontradicted evidence shows that the conditions under which the experimental test was made were not the same as the conditions prevailing when the accident occurred. When the accident occurred a rain was falling and the track was slippery and wet. When the experiment was made the track was dry, and the evidence is that a train can be stopped in less distance on a dry track than it can on a wet, slippery track.

We have carefully looked into this case and find nothing in it to take it out of the rule so frequently and consistently applied in trespassing cases. The judgment is affirmed.