## Henry's Adm'x v. Illinois Cent. R. Co. et al.

Feb. 27, 1940.

M. L. Blackwell, Judge.

Vert C. Fraser for appellant.

Withers & Lisman and Trabue, Doolan, Helm & Stites for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

The appellant, Irene Henry, administratrix of the estate of her deceased husband, Wilbur R. Henry, brought this action against the appellees, Illinois Central Railroad Company and its employees, R. L. Linton, engineer, and W. O. Towery, fireman, in which she alleged that one of the company's trains ran over and killed the deceased. The accident happened near Blackford, Kentucky, between 2 and 2:30 a. m., August 3, 1938. Linton was the engineer, Towery the fireman and J. E. Tatum the brakeman on the train. These three parties were riding in the cab of the engine. The train was made up of 35 to 38 freight cars and carried a load of approximately 2,100 tons.

Henry's body was found at a point some 320 feet in the direction of Blackford from a bridge referred to

in the evidence as the bridge over Vaughn's ditch. It is approximately 1,800 to 2,000 feet from this point back to the place where a curve begins. There is a speed restriction post about half·way between the curve and the point where Henry's body was found.

The appellees were notified that the appellant would take the depositions of Linton and Towery as if upon cross examination. The depositions of these two parties were taken and also that of Tatum. At the trial objection was raised to the reading of Tatum's deposition on the ground that he was in the court room at the time. This objection was sustained. After the depositions of Linton and Tatum were read, the appellees, over the objection of the appellant, were permitted to cross examine these parties. At the conclusion of the appellant's evidence the appellees' motion for a peremptory instruction was sustained. From a judgment on the directed verdict this appeal is prosecuted.

The chief ground urged for reversal is that the court erred in giving the peremptory instruction. It is urged, however, that the court should have permitted Tatum's deposition to be read; that the appellees should not have been permitted to cross examine Linton and Towery after their depositions were read; and that certain errors were committed in the introduction of proof. In view of the questions raised, it becomes necessary to review briefly the proof.

In his deposition Linton stated that he was at his position on the right hand side of the cab as the train was coming out of the curve; he looked down the track and also back at the rear of the train as it was coming around the curve; he first noticed an object on the track when the engine was about four or five car lengths, or approximately 200 feet, from it; the light on the train would reveal an object for a distance of some 15 to 20 car lengths, or for a maximum of 800 feet; the night was clear and there was no mist or fog; a train such as the one in question could be stopped within a distance of some 15 to 20 car lengths, or approximately 600 to 800 feet; and he gave no signal or warning and made no effort to stop the train.

When Linton was cross examined at the trial, he stated again that he first saw the object when the engine

was within four or five car lengths of it, and also that the object was on the left hand rail or the opposite side from him; it looked like a "roll of paper or something," and it passed out of his vision when he got within about 50 feet of it; the track is level between the curve and the bridge, "and then it is just a little down grade and then up again"; the fireman had been firing the engine between the curve and the bridge, and when firing is being done there is a glare which "blinds you if you are looking at it, and lights the whole cab"; and the object was going out of his vision when the fireman said "It looks like a man." In response to the question as to whether he could have stopped the train, or done anything to keep from running over the object, he said: "There was no way in the world to have stopped the train to have kept from running over him."

Towery stated in his deposition that it is about 50 car lengths from the curve to the bridge over Vaughn's ditch; it is up grade from the curve to the bridge and then "you slant down a little bit and then up, it is a wave in the track"; he put in fire after he came out of the curve, and, as usual, he looked out of the window after putting in fire for the purpose of getting fresh air; he saw an object and turned around and Mr. Linton said, "What is that?" and he answered, "It looks like a man"; Linton said, "It is a paper or a dog or something"; no effort was made to stop the train; the object was about three to five car lengths in front of the engine when the engineer said, "What is that?"; it would have required a distance of about 20 car lengths to stop the train; and from his place in the cab a man standing on the track could be seen for a distance of about 15 car lengths.

When cross examined by the appellees at the trial Towery testified that, when they started around the curve, "I got down to put in the fire"; he did not know how far around the curve the train had gone when he completed firing; he put his head out the window; he had his head out the window when Linton said, "What is that?"; he then looked down the track and said, "It looks like a man to me"; the engine was some three to five car lengths from the object when he made this statement; he thought they were over the bridge when he saw the object; it was passing out of his vision when

he made the statement about it looking like a man; and nothing could have been done to save Henry.

The appellant insists that Tatum's deposition was admissible. Tatum was not made a party to the action, and since he was present at the trial, the trial judge correctly ruled that his deposition was not admissible. Section 606, subsection 8, Civil Code of Practice; Nashville C. & St. L. R. Co. v. Byars, 240 Ky. 500, 42 S. W. (2d) 719; Stevens' Adm'r v. Watt, 266 Ky. 608, 99 S. W. (2d) 753.

Tatum testified at the trial that he was sitting in the brakeman's seat in the cab of the engine; he had to stand up to see ahead; his vision was obstructed for some 60 feet in front of the engine; his attention was directed to the object by the statements of the engineer and the fireman; the object went out of his view just as he stood up to look down the track; he thought Towery was putting in some coal as they were coming around the curve; when he had done this he got up on the seat; "he (Towery) didn't say anything until the engineer asked someone a question. He didn't exactly ask him, after we got close to the bridge you might say on the bridge the engineer raised off his seat and said 'What is that' Mr. Towery, he looked out the window and by that time the engine was on well over the bridge, and Mr. Towery said 'That looked like a man' or something corresponding to that, I don't know exactly the answer he give him, but he said, 'That looked like a man' ''; and he asked Towery "Ain't he going to stop?"

The appellant offered evidence to the effect that in the daytime a person standing at the point where the curve sets in could see another lying on the track at the point where Henry's body was found and that there was no dip in the track. Two witnesses who had been brakemen for the I. C. testified that a train of 35 or 40 cars with a load of approximately 2,100 tons could be stopped within a distance of about 20 car lengths.

The coroner testified over the objection of appellant that a pint bottle of whisky about two-thirds full was found in Henry's pocket, and an empty pint bottle was found on the track near the body, but that he did not know whether or not Henry had been drinking. There was other proof that Henry was seen about 12 o'clock on

the night of August 3rd, and that he was drinking, but not drunk.

Henry's brother testified that about a year previous he had seen a freight train loaded with coal stop within seven or eight car lengths under track conditions similar to those at the point where the deceased was found. This witness and another testified that they had had conversations with Towery before the action was filed. They said in substance that Towery told them that the object which turned out to be the body of the deceased was discovered between the curve and the signal post. The court admonished the jury that the statements said to have been made by Towery on the occasion in question could be considered as competent testimony only as against him.

We have reached the conclusion from our examination of the record that the facts and circumstances before us bring the case well within the scope of those opinions where it has been held that a peremptory instruction in favor of the Railway Company was proper. Louisville & N. R. Co. v. Byrge's Adm'x, 273 Ky. 570, 117 S. W. (2d) 585; Louisville & N. R. Co. v. Pennington's Adm'r, 278 Ky. 436, 128 S. W. (2d) 934, and cases cited in those opinions. Henry was a trespasser, and the only duty owed him was the exercise of ordinary care to avoid injuring him after the discovery of his peril. The question is not whether the engineer, the fireman or the brakeman could have seen the deceased after the train came out of the curve, but rather was his body discovered in time to stop the train before it reached the point where he was lying on the track? The engineer testified both at the time his deposition was taken and at the time of the trial that he did not discover the object until he was about five car lengths from it, and that he did not know it was the body of a man. The testimony of the fireman is to the effect that, while he was looking out the window, his attention was not called to the object until the engineer asked, "What is that?" At this time the train was within three to five car lengths of the object.

Aside from the testimony of the brother of the deceased, all the testimony goes to show that the train could not have been stopped within a distance of less than 600 to 800 feet. We do not think that his state-

ment that he had seen a freight train loaded with coal stop within a distance of approximately 300 feet under similar track conditions is such substantial evidence as to warrant the submission of the case to the jury on the question of whether or not the peril of the deceased was discovered in time to stop the train.

It follows from what has been said that we are not of the opinion that any errors substantially prejudicial to the appellant's rights were committed during the trial. Whether the trial judge committed a technical error in permitting the cross examination of the engineer and the fireman after their depositions were read, is not material, since it can be seen that their testimony, regardless of when given, would not have warranted the submission of the case to the jury.

Judgment affirmed.